Estate of Paul S. Brown, Deceased, M. Lawal Brown, Administrator v. Commissioner.
Estate of Brown v. Commissioner
Docket No. 80311.
United States Tax Court
T.C. Memo 1960-265; 1960 Tax Ct. Memo LEXIS 25; 19 T.C.M. (CCH) 1479; T.C.M. (RIA) 60265; December 9, 1960
*25 Held, that the transfer of a 360-acre farm by decedent to his son approximately 14 months prior to his death was not a transfer made in contemplation of death; Held, further, that no portion of the decedent's estate was trust property belonging to the decedent's son; Held, further, that the decedent's son did not contribute any part of the purchase price of certain items of property held jointly by the decedent and his son at the date of death. James W. R. Brown, Esq., Insurance Bldg., Omaha, Neb., for the petitioner. Richard J. Shipley, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion
*26 MULRONEY, Judge: The respondent determined a deficiency in estate tax against the petitioner in the amount of $27,512.18. The issues are: 1. Whether the value of a 360-acre farm transferred by the decedent to his son approximately 14 months prior to his death is includible in decedent's gross estate as a transfer made in contemplation of death; 2. Whether any portion of the decedent's estate was trust property belonging to decedent's son, Lawal, and, therefore, excludable from decedent's gross estate; and 3. Whether decedent's son, M. Lawal Brown, contributed any part of the purchase price of various items of property held jointly by the decedent and his son at the date of death. Petitioner alleges that it made an overpayment of its estate tax and claims a refund for same. Certain concessions made by the parties will be given effect in the Rule 50 computation. Findings of Fact Some of the facts were stipulated and they are found accordingly. The decedent, Paul S. Brown, died intestate on November 19, 1954 and the Federal estate tax return for his estate was filed with the district director of internal revenue for the district of Iowa at Des Moines, Iowa. M. Lawal *27 Brown, hereinafter called Lawal, is the decedent's only child and the administrator of his estate. On September 9, 1933 various parcels of land were transferred from the estate of M. L. Brown (decedent's father who had died in 1929) to John D. Hall, the decedent's mother's brother, and to the Iowa National Bank, Des Moines, Iowa, in consideration of the release by the grantees of all claims against the estate. This conveyance was not recorded until November 20, 1939. One of the properties transferred was a 360-acre farm in Palo Alto County, Iowa, hereinafter called the Moody farm. On September 18, 1933 John D. Hall conveyed his interest in these parcels of land to Paul S. Brown, the decedent, and to his brother Earl. This conveyance was not recorded until November 22, 1952. On September 29, 1939 the Iowa-Des Moines National Bank and Trust Co. conveyed its interest in these same parcels of land to decedent and to Earl. This conveyance was not recorded until November 22, 1952. In 1950 the first partial division was made by decedent and Earl of properties which had been in the estate of decedent's parents. Decedent's father had died in 1929 and his mother in 1940. Decedent and his *28 brother Earl were the sole beneficiaries of both estates. Earl was administrator of his father's estate and executor of his mother's estate. In the 1950 division the decedent received the property known as the Leduc farm, and over the years 1951, 1952 and 1953 Lawal made extensive improvements on the farm. On September 26, 1952 Earl and his wife executed a quit claim deed of the Moody farm to decedent but it was not until some time in the summer of 1953 that decedent's title was perfected. Decedent conveyed the Moody farm to Lawal on September 4, 1953 by deed of gift and he and his wife each executed a Federal gift tax return on the same date covering the transfer and reported a total gift in the amount of $54,000. On October 5, 1950 the decedent, while in San Diego, California, suffered a stroke affecting his speech and facial muscles. He was hospitalized until October 13, 1950. He continued to visit a doctor every month in San Diego, as often as three or four times in some months, from November 1950 through May 1951 and from November 1951 through April 1952. During this time he was treated for arteriosclerotic heart disease and for a diabetic condition. From April 1952 until *29 the date of his death, November 19, 1954, with the exception of the summer months which he spent in Iowa, the decedent continued his visits to a doctor, though with less frequency. Digitalis and various other drugs were prescribed for decedent during this period. In September 1952 the decedent made several visits to a doctor in Emmetsburg, Iowa, to be treated for hypertension and for high blood pressure. On September 30, 1952, while driving from Iowa to California, the decedent was admitted into a hospital in Sioux City, Iowa, where he remained until October 7, 1952. The diagnosis at the hospital was bronchial pneumonia and after his discharge from the hospital he continued on his trip to California driving part of the way. In the summer of 1953 the decedent visited a doctor in Emmetsburg several times to be treated for hypertension and other ailments. On January 24, 1954 the decedent was hospitalized in San Diego for 17 days, during which time he was treated for his heart disease. The final diagnosis was (1) arteriosclerotic cardio-vascular disease, and (2) paroxysmal auricular tachycardia. Decedent died on November 19, 1954 at the age of 74. The cause of his death was a coronary *30 occlusion. Decedent's mother, Nettie S. Brown, created separate spendthrift trusts for decedent and Earl in her will which came into effect at her death in 1940, and her will provided that the trusts would terminate when decedent's and Earl's creditors were paid off. On June 19, 1940 Lawal acquired title to the Waverly Hotel in Emmetsburg, Iowa, from his grandmother, Nettie S. Brown. Prior to this transfer the decedent had managed the hotel. From June 19, 1940 until December 1945 decedent continued to operate the hotel, and during this time he kept the proceeds from such operation. Decedent operated the hotel together with his wife and with the assistance of a janitor and a maid. The hotel was then closed and it was reopened by Lawal for operation in May 1946, at which time Lawal assumed management of the hotel. Lawal sold the Waverly Hotel in 1947 for $37,500. Subsequent to the sale Lawal closed out the two bank accounts maintained for the hotel, and on December 13, 1947 he deposited in his own bank account the amount of $9,512.58 from the closed out accounts. In his Federal income tax returns for 1943, 1944 and 1945 the decedent included in his gross income the net income from *31 the hotel operation in the amounts of $377.21, $2,780.27 and $1,264.62, respectively. In each of these years the profit and loss statement of the hotel does not indicate any payments of salaries and wages, but merely indicates expenditures for labor ranging from about $580 in 1944 to about $770 in 1943. In 1936 Nettie S. Brown conveyed a ranch in California to her grandson, Lawal. In 1941 the ranch was sold and the proceeds of the sale in the amount of $10,898.70 were deposited in April 1941 in the Iowa Trust & Savings Bank in an account entitled "Brown, M. L. SPECIAL." Decedent had authority to draw checks on the account. Subsequently, about $6,000 was withdrawn from the account to pay for work done on the Waverly Hotel. By December 1942 the balance in the account was $193.82. In 1944 Lawal received a bequest of $38,883.83 from the estate of John D. Hall. It is stipulated (1) that one of the distribution checks in the amount of $11,500 was deposited in the Iowa Trust & Savings Bank and that the bank issued certificates of deposit in the same amount (No. 1247, $1,500; No. 1248, $2,000; No. 1249, $8,000) which were payable to Lawal or to the decedent; (2) that one of the distribution *32 checks, in the amount of $26,304.39, was deposited by the decedent in the bank and that the bank issued certificates of deposit in the same amount which were payable to the decedent; and (3) that one of the distribution checks, in the amount of $1,079.44, was deposited by the deceednt in the Iowa Trust & Savings Bank in the "Brown Special Account, Paul S. Brown." The certificate of deposit No. 1247, mentioned above, in the amount of $1,500, was cashed on October 30, 1944 and on the same date the Iowa Trust & Savings Bank issued a cashier's check in the same amount. The check was cashed in May 1945 and in the same month United States Government Series E Bonds in the face amount of $2,000 were acquired in the joint names of decedent and Lawal. Certificate of deposit No. 1248, in the amount of $2,000, was endorsed by decedent and paid on November 24, 1944. It has been stipulated that the rest of the certificates of deposit, amounting to $34,304.39, were endorsed and cashed by decedent in 1945 and in 1947 as follows: Date Cashed
Amount
May 21, 1945
$5,000.00
October 17, 1945
6,304.39
December 4, 1945
5,000.00
February 15, 1947
8,000.00
November 29, 1947
5,000.00
December 2, 1947
5,000.00
*33 On November 10, 1944 Lawal executed a power of attorney granting to decedent, among other rights and powers, the right to receive all legacies and bequests payable at any time to Lawal. The power of attorney remained unrevoked until decedent's death. Decedent gave Lawal a $1,000 check when he married in October 1945. Decedent paid all of the expenses for Lawal and his wife of a trip to Florida some time in the early part of 1946. Lawal also received from the Waverly Hotel bank account $500 for the purchase of a wedding ring and, in 1946, a further amount of $1,000. On March 1, 1948 an apartment building was purchased in San Diego, California, for a total consideration of $40,000 in the joint names of decedent and Lawal and their respective wives. An undivided one-half interest was in the name of decedent and his wife as joint tenants, and an undivided one-half interest was in the name of Lawal and his wife as joint tenants. The "ESCROW INSTRUCTIONS" provided for a down payment of $9,000 and a note and trust deed for the balance. Decedent issued checks in the amount of $9,000 for the down payment and through the year 1953 he issued additional checks to apply toward the trust deed, *34 plus interest, in the total amount of at least $12,868.93. At the date of his death the decedent owned jointly with Lawal various certificates of deposit, Government bonds, and savings and loan accounts, as follows: Date
Items
Acquired
Amounts
5 Certificates of Deposit
10/ 5/54
$ 4,062.95
4 U.S. Government E Bonds
5/19/45
2,000.00
Savings and loan accounts not shown
21,521.15 Decedent also owned a United States Government E Bond jointly with his grandson, Michael L. Brown, in the amount of $470. In the estate tax return for decedent's estate, the certificates of deposit in the amount of $4,062.95 and Government bonds in the amount of $2,000 were included in the gross estate. With respect to the savings and loan accounts, Lawal's affidavit attached to the estate tax return offers the following explanation says: That he is a resident of the town of Emmetsburg, County of Palo Alto, State of Iowa; that he is 45 years of age and the son of Paul S. Brown; that for many years affiant owned the Waverly Hotel at Emmetsburg; that in the years 1942 to 1945 affiant was in the military service; that from the year 1940 to the year 1946, a period of six years, *35 the said Paul S. Brown operated said Waverly Hotel so owned by affiant and did not pay anything as rent or remuneration for the use of said property; that the fair rental value of the use of said hotel during said period of time was $450.00 per month; that said hotel was sold by affiant in 1947 and from that time on, it rented for the sum of $450.00 per month; that it was the understanding and agreement between affiant and his father that in lieu of paying rent for the use of said hotel property, the said Paul S. Brown would use an equivalent amount of money and invest it in the name of himself and the said M. Lawal Brown as joint tenants, which was done and the money which would have been realized as rent from said property, had the same been paid, is represented in the savings accounts listed and described in the Inventory herein as in the name of Paul S. Brown and this affiant as joint tenants; that said rental use of said hotel was not paid for, or any other thing of value given to affiant for same, but by the understanding with the said Paul S. Brown, said savings accounts were created by money advanced by the said Paul S. Brown for that purpose in lieu of the payment of rent. *36 Respondent determined that the savings and loan accounts and the bond, in the total amount of $21,991.15, were also includible in the decedent's gross estate. On the Federal estate tax return which was filed for the decedent's estate the value of the decedent's gross estate was reported to be $208,825.46. The administrator disclosed in this return the 1953 transfer of the Moody farm but did not include it in the gross estate. Respondent determined that the decedent's transfer of the Moody farm in 1953 was a transfer made in contemplation of death and he included the farm in decedent's gross estate at a value of $63,421.87. The transfer of the Moody farm by decedent to his son Lawal was not a gift made in contemplation of death. Opinion Decedent was 73 years old when he gave the Moody farm to his son. He died some 14 months later. Respondent has determined the gift was in contemplation of death. The burden to prove such determination erroneous was on petitioner. We are convinced petitioner sustained its burden and have made a finding to that effect. The age and health of decedent are facts to be considered. Decedent was 73 years old at the time of the gift and all of the *37 lay witnesses gave evidence of his being a man in good health for a man of his age. The only doctor who saw him professionally in the summer of 1953 testified (as respondent's witness) that decedent's general health was "Very good." Decedent's father had died at the age of 84 and his mother at the age of 85. His mother's brother died at the age of 95. The illness experience is a factor to be considered. In 1950, decedent suffered a stroke. The evidence indicates it was not severe. His son called it a "mild" stroke and he testified decedent walked to the car, and walked into the hospital and after two or three weeks in the hospital he was discharged and his son took him home where he walked to his third floor apartment. The son also testified he had a slight impediment in his speech for a time but that soon went away and "it wasn't long [before] he was driving his car again, doing the things he always did." He continued his yearly automobile trips from Iowa to California where he would do part of the driving. Decedent did thereafter consult doctors and he had monthly checkups and sometimes he was treated for hypertension and other ailments of a non-disabling type. His next real *38 illness was the attack of bronchial pneumonia while enroute to California in the fall of 1952. He was hospitalized for seven or eight days and after his discharge he continued on to California, driving part of the way. We think the conclusion warranted that decedent had apparent good health for a man 73 years old. In spite of the stroke he had suffered some three years prior to the gift, he had resumed his normal activities which included driving his car daily and visiting the farms and making his annual trips to California in the winter months. There is much affirmative evidence that the Moody farm was in a run-down condition and decedent transferred it to Lawal because he wanted Lawal to take over the job of improving it and managing it. The evidence is to the effect that decedent wished to be relieved of the problems in connection with improving the Moody farm and he was well pleased with Lawal's restoration of the run-down Leduc farm and decedent wanted Lawal to do the same with the Moody farm. Respondent admits on brief that this motive is supported by the evidence and that this motive "very likely was one of the considerations prompting the decedent to make the transfer." But *39 respondent argues "the various circumstances involved make it improbable that this was the dominant motive." It fairly appears from respondent's argument that the chief "circumstances" relied upon by respondent are the state of decedent's health at the time of the gift, which, respondent argues, was not good, and what respondent calls the "timing" of decedent's efforts to get the Moody farm so that he could give it to Lawal. We have already disposed of the circumstance of decedent's health by our conclusion that his general health at the time of the gift was good. Respondent places decedent's efforts to get the Moody farm out of the assets of his mother's estate shortly after decedent's heart attack in the fall of 1950, and he argues this fact and statements made by decedent in 1951 that he hoped to get the Moody farm and turn it over to Lawal indicate a testamentary plan that included the transfer of the farm to Lawal. All of the evidence shows that decedent had been trying for many years, long before his stroke in 1950, to get Earl to act to settle up his parents' estates. He had succeeded in getting Earl to make a partial distribution in 1950 when decedent received the Leduc *40 farm. The evidence specifically shows that decedent's efforts to get a division of the estates were motivated by his desire to improve the real estate that he would get. The record indicates decedent's stroke had nothing to do with respect to decedent's efforts to get the estates settled. There was other evidence suggesting decedent had an income tax saving motive and the transfer might have been made in fulfillment of the wishes of decedent's mother who had told decedent back in the 1930s she would like to see Lawal "have the farm." These are all motives associated with life and they contradict the assumption of contemplation of death. United States v. Wells, 283 U.S. 102; Estate of May Hicks Sheldon, 27 T.C. 194; Hoover v. United States, 180 F. Supp. 601. We hold the gift of the Moody farm to Lawal was not in contemplation of death and its value should not be included in decedent's estate for estate tax purposes. The next issue is whether a portion of the property held by decedent at his death was trust property and therefore not includible in his gross estate. Petitioner argues that Lawal gave to the decedent for investment and safekeeping *41 the proceeds from the sale in 1941 of a ranch in California, a bequest received in 1944 by Lawal from the estate of John D. Hall, and the sum of $1,597 on April 16, 1948, and that decedent collected and retained the proceeds of the Waverly Hotel, which was owned by Lawal, from 1940 through 1945 under an agreement that decedent would "make it up to Lawal at a later date." Petitioner then contends "that the decedent became a trustee of these funds and that there should be excluded from his estate the trust assets or deducted therefrom the amount for which the decedent was under an obligation to account to Lawal as a result thereof." Petitioner also argues that interest on these amounts should be taken into consideration. In the petition the amounts involved are as follows: proceeds from the hotel with interest at 6 per cent, $27,230; ranch proceeds, $10,898.70, with interest at 6 per cent, $8,228.54; bequest, $38,883.83, with interest at 6 per cent, $23,398.68; and the sum of $1,597, with interest at 6 per cent, $383.28. The total amount of these items is $110,620.03. On brief, however, the amounts are revised as follows: ranch proceeds, $10,898.70; hotel proceeds, $8,107.92; and bequest, *42 $38,883.83. Petitioner then admits that Lawal received $6,000 of the ranch proceeds to repair the Waverly Hotel; that decedent gave to Lawal $1,500 of the hotel proceeds; and that decedent made payments of $24,868.93 toward the purchase price of an apartment building in San Diego, California, in which Lawal had a one-half interest and that, consequently, the amount of $12,434.46 should be treated as a return of Lawal's funds. This would leave a total of $37,955.99 ($57,890.45 minus $19,934.46) still remaining and to this amount the petitioner adds interest in the amount of $10,855.94, making a total of $48,811.93 as the amount of the purported trust funds. We do not believe that the evidence establishes a trust. No trust is created unless the settlor manifests an intention to impose enforceable duties. Restatement, Trusts 2d, Section 23. The very gift of the farm in 1953 is some indication that decedent did not consider he was under a trust obligation to turn over some $37,955.99 to his son. The evidence is vague and incomplete and there is too much left to conjecture. In fact, some of the evidence strongly suggests that the parties did not intend such a relationship, and this *43 is especially true because of the background of these transactions. There are indications in the record that decedent and Earl were in financial difficulties in the late 1930s and in the 1940s. Their mother, Nettie S. Brown, created spendthrift trusts for them in her will which were not to be terminated until their creditors were paid. The record also shows unexplained delays as long as 19 years (1933 to 1952) in recording transfers of property to decedent and to Earl. This evidence, together with the pattern of property transfers from Nettie S. Brown and her brother John to Lawal, circumventing decedent and Earl, permits a strong inference that the various property transfers in the Brown family, whether by gift or by will, were made with the precarious financial condition of decedent and Earl in mind. The inference is strong that decedent might well have considered Lawal was not the beneficial owner of bequests and devises from decedent's mother and uncle and Lawal acquiesced in this view. It is also significant in this connection that in November 1944 Lawal executed a power of attorney granting to decedent broad rights and powers, including the right to receive all legacies and *44 bequests payable at any time to Lawal, and that this power of attorney remained in force until decedent's death. Lawal was about 34 years of age when he executed this power of attorney which remained in force about 10 years. We perceive no satisfactory explanation why Lawal, at a mature age, felt it necessary to put all of his affairs in the hands of his father over this period of time. There is no evidence in the record as to the $1,597 which Lawal purportedly gave to decedent on April 16, 1948. As to the three other items of property which form the basis of the trust argument, Lawal acquired the ranch (1936) and the Waverly Hotel (1940) from his grandmother, Nettie S. Brown, and the bequest (1944) from her brother, John D. Hall. We are told nothing about the management of the ranch from 1936 until 1941 or who received the income, if any, during that time. It merely appears that the proceeds from the sale of the ranch in the amount of $10,898.70 were deposited in an account entitled "Brown, M. L. SPECIAL" and that the decedent had authority to draw checks on this account. When Lawal was asked whether he also had authority to draw on this account, his answer was "I don't think so, *45 I don't know for sure. I don't remember." In any event, about $6,000 was withdrawn to pay for work done on the hotel, and by December 1942 the balance in the account was $193.82. Lawal testified that he did not know what happened to these withdrawals, although it does appear from his testimony that the decedent used these funds for his personal use. Decedent had managed the Waverly Hotel for several years prior to 1940, the year in which Nettie S. Brown conveyed the hotel to her grandson, Lawal, and the decedent continued just as before to manage the hotel through the end of 1945. Petitioner's argument that the decedent operated the hotel under an agreement to account for the proceeds later to Lawal is not supported by the evidence. Although petitioner argues that this agreement covered the years 1940 through 1945, there is testimony by Lawal that the "conversation or discussion" with the decedent about the hotel proceeds took place about the middle of 1942. All we are told by Lawal about this so-called agreement is that decedent "said he would keep them [the proceeds] and make them up to me later." Lawal testified he had no idea as to what happened to the hotel profits and when *46 he was asked whether decedent kept any records of the hotel, he answered "I don't know, I can't find them." Nothing is said about compensation for decedent in the years when he operated the hotel. The record shows that decedent in his Federal income tax returns for 1943, 1944 and 1945 included in his gross income the net income from the hotel operation in the amounts of $377.21, $2,780.27 and $1,264.62, respectively. These amounts may well have been regarded as compensation for decedent, and we cannot tell how much, if anything, remained of the income from the hotel operation. We might note that the hotel was a small one and that apart from the work done by decedent and his wife, it required merely the services of a janitor and a maid. It also appears that Lawal took over the management of the hotel in May 1946 and that he sold it on November 28, 1947 for $37,500. Lawal then made the following bank deposits: November 29, 1947
$6,625.00
December 11, 1947
6,630.16
December 13, 1947
9,512.58 When Lawal was asked to explain the last deposit of $9,512.58, he testified that subsequent to the sale he closed out two bank accounts kept for the hotel operations and deposited *47 them in his own bank account. For all we can tell from the record, a portion of this money in the hotel accounts may have represented a return to Lawal of proceeds from the hotel operation in the years prior to 1946. Nor does the manner in which the decedent and Lawal handled the bequest of $38,883.83 from John D. Hall show any intention to create a trust relationship with respect to the funds. The record shows that $1,500 of this amount was used in 1945 to purchase $2,000 face value of Series E Bonds in the joint names of Lawal and the decedent. Another $2,000 was used by decedent apparently to purchase Series E Bonds in the joint names of himself and his wife. It is stipulated that $34,304.39 of the bequest was converted into certificates of deposit in October 1944 and March 1945 and it is further stipulated that over a period from May 21, 1945 through December 2, 1947 all of the certificates were endorsed and cashed by the decedent. There is nothing in the record, apart from some wholly unsupported conjectures by Lawal, to establish where these funds went or what was done with them by the decedent. Lawal merely testified that he never had possession of the various certificates *48 of deposit and that none of the money was given to him after the certificates were cashed by the decedent. As far as the record shows, the decedent treated these funds as his own. There is no evidence to support petitioner's contention that a trust relationship was intended. We hold that the petitioner has failed to establish that any portion of decedent's estate was trust property to be excluded from his gross estate. At the date of his death, the decedent owned jointly with Lawal five certificates of deposit ($4,062.95), four Government bonds ($2,000) and six savings and loan accounts ($21,521.15). Decedent also owned a Government bond jointly with Lawal's son, in the amount of $470. Petitioner included the five certificates of deposit and the four Government bonds, held jointly by decedent and Lawal, in the decedent's gross estate. Respondent, in his notice of deficiency, determined that the six savings and loan accounts as well as the $470 bond in the total amount of $21,991.15, were also includible in the gross estate. Petitioner now claims that all of these items held jointly by decedent and Lawal, in the total amount of $28,054.10, should be excluded from the decedent's *49 gross estate. Respondent has now conceded that the four Government bonds ($2,000) should be excluded from the gross estate. Section 2040, Internal Revenue Code of 1954, provides that a decedent's gross estate shall include the value of all property held as joint tenants by decedent and another person "except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth." Petitioner argues on brief that "it is not necessary to show the contribution to these joint tenancies. The funds turned over to the decedent by Lawal were trust funds and the decedent's estate should be reduced by the amount by which the decedent was obligated to account as trustee. It is not necessary to trace these funds into specific assets." We have held against the petitioner on the trust argument, and therefore the petitioner's contention as to these specific jointly held assets must also fail, since it is dependent on the trust agreement. Moreover, we have examined the record carefully and we are unable to find that *50 Lawal contributed toward these jointly held assets which are still in issue. Petitioner has even failed to establish with any degree of certainty the dates when the six savings and loan accounts were created. These accounts are in the total amount of $21,991.15, which is a substantial portion of the total amount of jointly held assets here discussed. It appears from the record that the decedent received a substantial distribution upon the partial settlement of the estates of Nettie and M. L. Brown in October 1954. Lawal was asked on crossexamination whether three of the accounts were created subsequent to the distribution and his answer was: "They might have been. I knew we had the money that time and he was doing something with it. We were trying - I don't remember exactly on that, no." This testimony seems to contradict Lawal's affidavit, attached to the decedent's estate tax return, which indicated that the savings and loan accounts represent the proceeds from the hotel operation which decedent purportedly agreed to reimburse to Lawal. The evidence as to these jointly-held assets is vague and inadequate. There is nothing in the record to support a finding that Lawal contributed *51 toward the jointly held assets in the amount of $26,054.10. We hold that these items are includible in decedent's gross estate. Decision will be entered under Rule 50.